THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| SINCLAIR BROADCAST GROUP, INC., | * | |
| Plaintiff, | * | |
| v. | * | |
| MICHAEL DRAMAN, | * | Civil Action No.: MJG-03-341 |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT MICHAEL DRAMAN'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant Michael Draman ("Draman"), by his undersigned counsel, hereby submits this Memorandum in Opposition to the Motion for Summary Judgment filed by Plaintiff Sinclair Broadcast Group, Inc. As this memorandum will demonstrate, there are genuine disputes with respect to the material facts in this case. Sinclair is thus not entitled to summary judgment as a matter of law.

### I.   INTRODUCTION

This matter arises out of a dispute between Sinclair Broadcast Group, Inc. ("SBG") and Michael Draman, a former employee of Sinclair Communications, Inc. ("SCI"), over money allegedly due by Draman to SBG under a line of credit Draman had with NationsBank, N.A. On December 31, 2002, SBG filed suit against Draman in the Circuit Court for Baltimore County alleging breach of contract. On February 4, 2003, Draman removed the case to this Court. SBG now seeks summary judgment.

In its Motion for Summary Judgment, SBG completely omits relevant and material facts regarding: (1) the circumstances surrounding the necessity for Draman to enter into a line of credit after SCI reneged on its promise to advance Draman $200,000 against future stock options, (2) SCI's premature termination of Draman's employment, and (3) threats of financial and professional ruin made by SCI and SBG to Draman if he did not sign a General Release and agree to forego $182,000 that SCI was contractually obligated to pay him.

As more fully set forth below, SBG's argument for summary judgment ignores material facts in this case and disregards governing Maryland law. Accordingly, SBG's Motion for Summary Judgment should be denied.

## II.   FACTS

From February 19, 1997 until April 23, 2001, Draman was the Vice President--Television Sales and Marketing of SCI. *See* Affidavit of Michael Draman (hereinafter "Draman Aff."), ¶ 2, attached hereto as Exhibit 1. SCI and SBG (collectively "Sinclair") through their wholly-owned subsidiaries, owns or operates television broadcast stations. *Id.*, ¶ 3.

Draman's employment with SCI was governed by an Employment Agreement, dated February, 1997, (the "Employment Agreement") and an August 3, 1998 Amendment No. 1 to the Employment Agreement (the "Amendment"), copies of which are attached to the Draman Aff. as Exhibits A and B, respectively. Draman Aff., ¶ 4. Pursuant to Paragraph 1 of the Amendment, Draman's employment with SCI was to extend through and until December 31, 2002. *Id.*

In May, 1997, Draman entered into a Premium Creditline Agreement with NationsBank, N.A. ("NationsBank'), in the amount of $200,000.00, in connection with his purchase of a house in the Baltimore, Maryland area (the "Creditline Agreement"). SCI had initially agreed to advance Draman $2000,000.00 against future stock options in order to offset the cost of living increase he would incur by moving to the Baltimore area. Draman Aff., ¶ 5. After agreeing to advance Draman $200,000.00, SCI thereafter told him that it did not want to carry the advance on its books. *Id.* SCI then arranged for the Creditline Agreement to be put in Draman's name, with SCI providing a guaranty. *Id.* Pursuant to Section 11.2 of the Employment Agreement, SCI agreed to provide a guaranty to NationsBank for any loan or line of credit that Draman took out to purchase a house, in an amount not to exceed $200,000.00. The Creditline Agreement is the subject of the instant lawsuit. *Id.*

On or about December 19, 2002, after forcing Draman to sign a General Release, SBG purchased the Creditline Agreement from Bank of America, successor to NationsBank, and thereafter brought this action against him. Draman Aff., ¶ 6.

2

Paragraph 6 of the Amendment to Draman's Employment Agreement provides:

> [I]f Employee's employment with [SCI] terminates [without cause] . . . Employee will be entitled to receive, and [SCI] will pay to Employee, all of the following:
>
> (1) the salary payable to Employee for the one-year period ending on the first anniversary of the Termination Date, such salary to be paid on the dates when such salary would have been paid in accordance with [SCI's] normal payroll procedure; and
>
> (2) any bonuses which would have been earned by Employee during the one-year period ending on the first anniversary of the Termination Date, such bonuses, if any, to be paid on the dates they would have been paid had Employee remained an employee of [SCI] during such period.

Draman Aff., ¶ 7.

In April, 2001, Don Thompson, the Director of Human Resources and Vice President of SCI, informed Draman that SCI was terminating his employment, without cause, effective April 23, 2001. Draman Aff., ¶ 8. Accordingly, pursuant to Paragraph 6 of the Amendment, SCI was required to pay Draman his full salary through and until April 23, 2002, as well as any bonuses that he would have earned during that one-year period. *Id.* At the time SCI terminated his employment, Draman's yearly salary was $270,000, and he received yearly bonuses totaling $55,000. *Id.*, ¶ 9.

After learning that SCI had terminated his employment without cause, Draman discussed with David Smith, the Chief Executive Officer of Sinclair, that pursuant to the Employment Agreement and the Amendment, Draman was to continue to receive his full salary for one year. Smith informed Draman that, notwithstanding the Employment Agreement and the Amendment, SCI refused to pay him a year's salary or any bonuses. Don Thompson further informed Draman that if Draman did not sign a General Release, releasing SCI and SBG from any and all obligations and responsibilities under the Employment Agreement and Amendment, and accept only a seven-month's salary, Sinclair would "make [his] life miserable" and would "create a cause" for Draman's termination. Draman Aff., ¶ 10.

On or about April 23, 2001, Draman signed a General Release under the threat of reprisal from Sinclair and would not have otherwise signed it. A copy of the General Release is attached

to the Draman Aff. as Exhibit C. The business of sales and marketing for a television broadcast station is very competitive, and the national community is small. If Sinclair had followed through on its threat and manufactured a cause for his termination, such action would have had a devastating effect on Draman's career and ability to find similar employment elsewhere. Draman Aff., ¶ 11.

Sinclair owed Draman $325,000 pursuant to the Employment Agreement and Amendment but paid him only $143,000. Sinclair, therefore, currently owes Draman $182,000. Draman Aff., ¶ 12.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when the pleadings, discovery and affidavits filed in the case demonstrate that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation." *Caussade v. Brown*, 924 F. Supp. 693, 696 (D. Md. 1996). "If there clearly exists factual issues 'that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party,' then summary judgment is inappropriate." *Fairclough v. Board of County Commissioners of St. Mary's County*, 2003 WL 355924 (D. Md. 2003)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). It is the movant's burden to show the absence of a genuine issue of material fact. *Sensormatic Security Corp. v. Sensormatic Electronics Corp.*, 2003 WL 1785870 *8 (D. Md. 2003).

When ruling on a motion for summary judgment, a court must consider the facts in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

### IV.  ARGUMENT

Noticeably absent from SBG's Motion for Summary Judgment is any mention whatsoever of the Employment Agreement or the Amendment. Nor is there any mention of SCI's unclean hands in terminating Draman's employment prematurely and thereafter forcing

him to sign a General Release by threatening to manufacture a cause for his early termination, a move that would have effectively ended Draman's career. Maryland law does not permit a court to sanction such conduct.

The doctrine of unclean hands "refuses recognition and relief from the court to those guilty of unlawful or inequitable conduct pertaining to the matter in which relief is sought." *Hicks v. Gilbert*, 135 Md. App. 394, 400, 762 A.2d 986, 989-90 (2000)(internal citations omitted). The doctrine "protects the integrity of the court and the judicial process by denying relief to those persons whose very presence before a court is the result of some fraud or inequity." *Id*. When the plaintiff's conduct is the source or part of the source of its claim, the plaintiff's claim is barred because of its conduct. *Schneider v. Schneider*, 96 Md. App. 296, 306, 624 A.2d 1319, 1324 (1993), *rev'd on other grounds*, 335 Md. 500, 644 A.2d 510 (1994).

In the instant case, Sinclair's conduct forms the basis of SBG's claim against Draman. To induce Draman to accept employment and to offset the cost of living increase Draman would incur by relocating to Baltimore, SCI agreed to advance Draman $200,000 against his future stock options. SCI thereafter reneged on that agreement and arranged for the Creditline Agreement to be in Draman's name, with SCI providing a guaranty. Draman only entered into the Creditline Agreement because SCI had broken its initial promise to advance him $200,000 against future stock options.

Furthermore, pursuant to the Employment Agreement and Amendment, Draman's employment with SCI extended through and until December 31, 2002. Yet, in April, 2001, Don Thompson, the Director of Human Resources and Vice President of SCI, informed Draman that SCI was terminating his employment, without cause, effective April 23, 2001. David Smith, the Chief Executive Officer of Sinclair, then told Draman that although SCI was required under the Employment Agreement and Amendment to pay Draman his full salary of $270,00 through and until April 23, 2002, as well as bonuses totaling $55,000, SCI refused to so honor its obligations. Don Thompson further informed Draman that unless Draman agreed to sign a General Release, releasing SCI and SBG from their obligations under the Employment Agreement and

Amendment and accept only a seven-month's salary and forego any bonuses, Sinclair would "make [Draman's] life miserable" and would "create a cause" for his termination. In the face of financial and professional ruin, Draman was forced to accede to Sinclair's demands, and he signed the General Release. Under the Employment Agreement and Amendment, Sinclair owed Draman $325,000, *i.e.*, a full year's salary of $270,000 plus bonuses of $55,000. After forcing him to sign the General Release, Sinclair paid Draman only $143,000. Sinclair owes Draman $182,000.

After reneging on its promise to advance Draman $200,000 against future stock options, thereby giving Draman no other option than to enter into the Creditline Agreement with NationsBank; after prematurely terminating Draman from his employment; after threatening him with financial and professional ruin if he did not sign the General Release; and after refusing to pay him $182,000 that SCI was contractually obligated to pay under the Employment Agreement and Amendment, on or about December 19, 2002, SBG purchased the Creditline Agreement from Bank of America and brought suit against Draman for $201,910.69, plus interest, late fees, attorneys' fees and costs.

Despite its own blatant disregard of its contractual obligations to Draman, SBG now moves for summary judgment on the ground that Draman is, by contract, obligated to pay SBG under the Creditline Agreement. Yet no mention whatsoever is made by SBG of its own misconduct and unclean hands. SBG would have this court legitimize Sinclair's unlawful behavior. That is exactly what the doctrine of unclean hands is designed to prevent.

Because SBG, by its own actions, has created its breach of contract claim against Draman, summary judgment on the issue of whether and how much Draman owes SBG would be unlawful. Indeed, summary judgment is "inappropriate where matters--such as knowledge, intent or motive--that ordinarily are reserved for resolution by the fact-finder are essential elements of the plaintiff's case *or the defense.*" Hicks, 135 Md. App. at 400, 762 A.2d at 989 (internal citation omitted)(emphasis added).

## V. CONCLUSION

As demonstrated above, SBG has completely ignored material facts in this case regarding its own conduct that gives rise to its claim against Draman. Moreover, as a matter of law, SBG is not entitled to judgment in its favor. Accordingly, Defendant Michael Draman respectfully requests that his Court deny Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

/S/
Benjamin Rosenberg, Fed. Bar # 00263
Lynn E. Ricciardella, Fed. Bar # 25454
Rosenberg Proutt Funk & Greenberg, LLP
25 S. Charles Street, Suite 2115
Baltimore, Maryland 21201
(410) 727-6600
(410) 727-1115 (fax)

Attorneys for Defendant,
Michael Draman

## REQUEST FOR HEARING

Defendant Michael Draman respectfully requests that the Court schedule a hearing on Plaintiff's Motion for Summary Judgment and Defendant's opposition thereto.

/S/
Lynn E. Ricciardella

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 24th day of April, 2003, a copy of the foregoing Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, Affidavit of Michael Draman, with exhibits, and proposed Order was filed electronically pursuant to the stated e-filing procedures of this Court. Pursuant to those procedures, all other counsel are to receive copies electronically via the Court's e-filing system.

/S/
Lynn E. Ricciardella