## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

SINCLAIR BROADCAST GROUP, INC.,          *

      Plaintiff,          *

v.          *

MICHAEL DRAMAN,          *          Civil Action No.: MJG-03-341

      Defendant.          *

  *   *   *   *   *   *   *   *   *   *   *

### AFFIDAVIT OF MICHAEL DRAMAN

MICHAEL DRAMAN deposes and states as follows:

1.     I am over twenty-one (21) years of age and am competent to testify to the matters stated herein.

2.     From February 10, 1997 until April 23, 2001, I was the Vice President--Television Sales and Marketing of Sinclair Communications, Inc. ("SCI").

3.     SCI and the Sinclair Broadcast Group, Inc. ("SBG," and collectively with SCI "Sinclair"), through its wholly-owned subsidiaries, owns or operates television broadcast stations.

4.     Attached hereto as Exhibits A and B, respectively, is a true and accurate copy of my Employment Agreement with SCI, dated February, 1997, (the "Employment Agreement) and an August 3, 1998 Amendment No. 1 to the Employment Agreement (the "Amendment"). Pursuant to Paragraph 1 of the Amendment, my employment with SCI was to extend through and until December 31, 2002.

5.     In May, 1997, I entered into a Premium Creditline Agreement with NationsBank, N.A. ("NationsBank'), in the amount of $200,000.00, in connection with my purchase of a home in the Baltimore, Maryland area (the "Creditline Agreement"). SCI had initially agreed to advance me $200,000.00 against future stock options in order to offset the cost of living increase I would incur by moving to the Baltimore area. After agreeing to advance me $200,000.00, SCI

**EXHIBIT I**

thereafter told me that it did not want to carry the advance on its books. SCI then arranged for

the Creditline Agreement in my name and provided a guaranty. Pursuant to Section 11.2 of the

Employment Agreement, SCI agreed to provide a guaranty to NationsBank for any loan or line of

credit I took out to purchase a home, in an amount not to exceed $200,000.00. The Creditline

Agreement is the subject of the instant lawsuit.

6.     On or about December 19, 2002, after forcing me to sign a General Release, SBG

purchased the Creditline Agreement from Bank of America, successor to NationsBank, and

thereafter brought this action against me.

7.     Paragraph 6 of the Amendment to my Employment Agreement provides:

> [I]f Employee's employment with [SCI] terminates [without cause] . . . Employee
> will be entitled to receive, and [SCI] will pay to Employee, all of the following:
>
> (1) the salary payable to Employee for the one-year period ending on the first
> anniversary of the Termination Date, such salary to be paid on the dates when
> such salary would have been paid in accordance with [SCI's] normal payroll
> procedure; and
>
> (2) any bonuses which would have been earned by Employee during the one-year
> period ending on the first anniversary of the Termination Date, such bonuses, if
> any, to be paid on the dates they would have been paid had Employee remained an
> employee of [SCI] during such period.

8.     In April, 2001, Don Thompson, the Director of Human Resources and Vice

President of SCI, informed me that SCI was terminating my employment, without cause,

effective April 23, 2001. Accordingly, pursuant to Paragraph 6 of the Amendment, SCI was

required to pay me my full salary through and until April 23, 2002, as well as any bonuses that I

would have earned during that one-year period.

9.     At the time SCI terminated my employment, my yearly salary was $270,000, and I

received yearly bonuses totaling $55,000.

10.     After learning that SCI had terminated my employment without cause, I discussed

with David Smith, the Chief Executive Officer of Sinclair, that I was to continue to receive my

salary for one year, pursuant to the Employment Agreement and the Amendment. Smith

informed me that, notwithstanding the Employment Agreement and the Amendment, SCI refused

to pay me a year's salary or any bonuses. Don Thompson further informed me that if I did not sign a General Release, releasing SCI and SBG from any and all obligations and responsibilities under the Employment Agreement and Amendment, and accept only a seven-month's salary, Sinclair would "make my life miserable" and would "create a cause" for my termination.

11.     Attached hereto as Exhibit C is a true and accurate copy of a General Release that Sinclair forced me to sign on April 23, 2001. I signed the General Release under the threat of reprisal from Sinclair and would not have otherwise signed it. The business of sales and marketing for a television broadcast station is very competitive, and the national community is small. If Sinclair had followed through on its threat and manufactured a cause for my termination, such action would have had a devastating effect on my career and ability to find similar employment elsewhere.

12.     Sinclair owed me $325,000 pursuant to the Employment Agreement and Amendment but paid me only $143,000. Sinclair, therefore, owes me $182,000.

I declare under the penalty of perjury that the foregoing is true and correct. Executed this 21 day of April, 2003.

Michael Draman

# EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (this "Agreement") is effective as of the 10th day of February, 1997, between Sinclair Communications, Inc., a Maryland corporation ("SCI"), and Michael Draman ("Employee").

## RECITALS

A.     SCI, through its wholly-owned subsidiaries, owns or operates television broadcast stations.

B.     SCI desires to employ Employee as Vice President-Television Sales and Marketing of SCI, and Employee desires to accept such employment.

C.     SCI and Employee desire to set forth the terms of employment of Employee with SCI as Vice President-Television Sales and Marketing of SCI (including the granting to Employee of Stock Options).

**NOW, THEREFORE, IN CONSIDERATION OF** the mutual covenants herein contained, the parties hereto agree as follows:

1.     ***Duties.***

1.1.     ***Duties Upon Employment.***  Upon the terms and subject to the other provisions of this Agreement, commencing on the date hereof (the "Effective Date"), Employee will be employed by SCI in Baltimore, Maryland as Vice President-Television Sales and Marketing of SCI.  As the Vice President-Television Sales and Marketing, Employee will

(a)  report to the Chief Executive Officer of SCI and such other senior officers of SCI as the Chief Executive Officer ("CEO") designates; and

(b)  have such responsibilities and perform such duties as may from time to time be established by the Chief Executive Officer ("CEO") or such other senior officers.

dramemp.agr

1

EXHIBIT A

1.2. *Full-Time Employment*. While an employee of SCI, Employee agrees to devote Employee's full working time, attention, and best efforts exclusively to the business of Station.

2. *Term*. The term of Employee's employment as the Vice President-Television Sales and Marketing of SCI under this Agreement (the "Employment Term") will begin on the Effective Date and continue until the third anniversary of the Effective Date unless employment is terminated sooner in accordance with Section 4. As used in this Agreement, an "employment year" is a twelve (12) month period beginning on the Effective Date or an anniversary thereof and ending on the next following February 9.

3. *Compensation and Benefits*. Employee is entitled to the compensation and benefits described on Schedule A attached hereto on the terms and conditions stated therein. Contingent upon both Employee's execution of this Agreement and Employee's relocation of his primary residence to the Baltimore, Maryland area on or before September 1, 1997, Employee will also be granted options under the Long-Term Incentive Plan ("LTIP") to acquire twenty thousand (20,000) shares of stock of Sinclair Broadcast Group, Inc. ("Parent"), subject to the terms and conditions contained in the LTIP and the Stock Option Agreement (the "Agreement") attached hereto as Schedule B. On the second anniversary of the Effective Date, if the Employment Term has not been terminated, Employee will be granted additional options under the LTIP to acquire twenty thousand (20,000) shares of stock of Parent at a purchase price to be determined by the CEO in his sole and absolute discretion and on such other terms and conditions as are contained in the LTIP and the Agreement.

4. *Employment Termination*.

4.1. *Termination of Employment*.

(a) The Employment Term will end, and the parties will not have any rights or obligations under this Agreement (except for the rights and obligations under those Sections of this Agreement which are continuing and will survive the end of the Employment Term, as specified in Section 8.10 of this Agreement) on the earliest to occur of the following events (the "Termination Date"):

(1)   the death of Employee;

(2)   the Disability (as defined in Section 4.1(b) below) of Employee;

dramemp.agr

2

(3)    the election by Employee to terminate Employee's employment on February 9, 1999 (the "Early Termination Date"); provided, such notice must be given in writing to SCI at least 180 days prior to the Early Termination Date;

(4)    the election by SCI to terminate Employee's employment on the Early Termination Date without Cause (as defined in Section 4.1(c) below); provided such notice must be given in writing to Employee at least 180 days prior to the Early Termination Date;

(5)    the termination of Employee's employment by SCI with Cause; or

(6)    the third anniversary of the Effective Date

(b)    For the purposes of this Agreement, "Disability" means Employee's inability, whether mental or physical, to perform the normal duties of Employee's position for ninety (90) days (which need not be consecutive) during any twelve (12) consecutive month period, and the effective date of such Disability shall be the day next following such ninetieth (90th) day. If SCI and Employee are unable to agree as to whether Employee is disabled, the question will be decided by a physician to be paid by SCI and designated by SCI, subject to the approval of Employee (which approval may not be unreasonably withheld) whose determination will be final and binding on the parties.

(c)    For the purposes of this Agreement, "Cause" means any of the following: (i) the wrongful appropriation for Employee's own use or benefit of property or money entrusted to Employee by SCI, (ii) the commission of any act involving moral turpitude, (iii) Employee's continued willful disregard of Employee's duties and responsibilities hereunder after written notice of such disregard, (iv) Employee's continued violation of SCI policy after written notice of such violations (such policy may include policies as to drug or alcohol abuse), (v) any action by Employee which is reasonably likely to jeopardize a Federal Communications Commission license of any broadcast station owned directly or indirectly by SCI, or (vi) unsatisfactory performance by Employee of Employee's job or duties hereunder as determined by SCI in SCI's sole discretion.

4.2.  *Termination Payments*.

(a)    If Employee's employment with SCI terminates pursuant to Sections 4.1(a)(1), 4.1(a)(2), 4.1(a)(3), 4.1(a)(4) or 4.1(a)(6), Employee (or in the event of

drmtemp.agr

3

the death of Employee, the person or persons designated by Employee in a written instrument delivered to SCI prior to Employee's death or, if no such written designation has been made, Employee's estate) will be entitled to receive, and SCI will pay to the same, all of the following:

        (1)    the salary payable to Employee through the Termination Date;

        (2)    a payment in respect of unutilized vacation time that has accrued through the Termination Date (determined in accordance with corporate policies established by SCI and consistent with Schedule A hereof); and

        (3)    the benefits, if any, set forth in the Incentive Stock Option Plan, upon the terms and conditions set forth therein, but only to the extent that Employee is entitled to such benefits pursuant to the provisions of the Incentive Stock Option Plan.

        (b)    If Employee's employment with SCI terminates pursuant to Section 4.1(a)(5), Employee will be entitled to receive, and SCI will pay to Employee, only the salary payable to Employee through the Termination Date (and Employee shall not be entitled to any benefits under the Incentive Stock Option Plan); provided, however, that if Employee's employment terminates pursuant to Subsection (vi) of Section 4.1(c), Employee shall be entitled to the benefits, if any, set forth in the Incentive Stock Option Plan in accordance with the terms of Subsection (3) of this Section 4.2.

        (c)    The termination payments described in this Section 4 will be in lieu of any termination or severance payments required by SCI policy or, to the fullest extent permissible thereunder, applicable law (including unemployment compensation) and will constitute Employee's exclusive rights and remedies with respect to termination of Employee's employment.

    5.     *Confidentiality and Non-Competition*.

    5.1. *Confidential Information*.

    (a) Employee will:

        (1)    keep all Confidential Information in trust for the use and benefit of SCI, SBG, and any affiliate or subsidiary of SCI, or SBG (collectively, the

dramemp.agr

4

"Company Entities") and broadcast stations owned or operated directly or indirectly by any of the Company Entities;

(2)     not, except as required by Employee's duties under this Agreement, authorized by the General Counsel of SCI or as required by law or any order, rule, or regulation of any court or governmental agency (but only after notice to SCI of such requirement), at any time during or after the termination of Employee's employment with SCI, directly or indirectly, use, publish, disseminate, distribute, or otherwise disclose any Confidential Information (as defined below);

(3)     take all reasonable steps necessary, or reasonably requested by any of the Company Entities, to ensure that all Confidential Information is kept confidential for the use and benefit of the Company Entities; and

(4)     upon termination of Employee's employment or at any other time any of the Company's Entities in writing so request, promptly deliver to such Company Entity all materials constituting Confidential Information relating to such Company Entity (including all copies) that are in Employee's possession or under Employee's control. If requested by any of the Company Entities to return any Confidential Information, Employee will not make or retain any copy of or extract from such materials.

(b)     For purposes of this Section 5.1, Confidential Information means any proprietary or confidential information of or relating to any of the Company Entities that is not generally available to the public. Confidential Information includes all information developed by or for any of the Company Entities concerning marketing used by any of the Company Entities, suppliers, any customers (including advertisers) with which any of the Company Entities has dealt prior to the Termination Date, plans for development of new services and expansion into new areas or markets, internal operations, financial information, operations, budgets, and any trade secrets or proprietary information of any type owned by any of the Company Entities, together with all written, graphic, other materials relating to all or any of the same, and any trade secrets as defined in the Maryland Uniform Trade Secrets Act, as amended from time to time.

5.2. *Non-Competition*.

(a)     During the Employment Term and for six (6) months thereafter, if Employee's employment is terminated for any reason other than pursuant to Section 4.1(a)(3) or by Employee in violation of the terms hereof, or for one (1) year thereafter, if Employee's employment is terminated pursuant to Section 4.1(a)(3) or by

drameemp.agr

5

Employee in violation of the terms hereof, Employee will not, directly or indirectly, engage in the following conduct within any Designated Market Area (as defined below) or any Metro Survey Area (as defined below) in which any of the Company Entities owns or operates a broadcast station immediately prior to such termination:

(i)    participate in any activity involved in the ownership or operation of a broadcast station (other than, during the term, broadcast stations owned or operated by any of the Company Entities);.

(ii)    hire, attempt to hire, or to assist any other person or entity in hiring or attempting to hire any employee of any of the Company Entities or any person who was an employee of any of the Company Entities within the prior one (1) year period; or

(ii)    solicit, in competition with any of the Company Entities, the business of any customer of any of the Company Entities or any entity whose business any of the Company Entities solicited during the one (1) year period prior to Employee's termination.

(b)    Notwithstanding anything else contained in this Section 5.2, Employee may own, for investment purposes only, up to five percent (5%) of the stock of any publicly-held corporation whose stock is either listed on a national stock exchange or on the NASDAQ National Market System if Employee is not otherwise affiliated with such corporation.

(c)    As used herein, "participate" means lending one's name to, acting as consultant or advisor to, being employed by or acquiring any direct or indirect interest in any business or enterprise, whether as a stockholder, partner, officer, director, employee, consultant, or otherwise.

(d)    In the event that (i) SCI places all or substantially all of its broadcast stations up for sale within one (1) year after termination of Employee's employment hereunder, or (ii) Employee's employment is terminated in connection with the disposition of all or substantially all of such stations (whether by sale of assets, equity, or otherwise), Employee agrees to be bound by, and to execute such additional instruments as may be necessary or desirable to evidence Employee's agreement to be bound by, the terms and conditions of any non-competition provisions relating to the purchase and sale agreement for such stations, without any consideration beyond that expressed in this Agreement, provided that the purchase and sale agreement is negotiated in good faith with

dramemp.agr

6

FEB-19-2003  15:16        THOMAS & LIBOWITZ              .4107520979    P.09/19

customary terms and provisions, and the transaction contemplated thereby is consummated. Notwithstanding the foregoing, in no event shall Employee be bound by, or obligated to enter into, any non-competition provisions referred to in this Section 5.2(d) which extend beyond six (6) months or one (1) year (as applicable in accordance with Section 5.2(a)), in each case from the date of termination of Employee's employment hereunder or whose scope extends the scope of the non-competition provisions set forth in Section 5.2(a) (as limited by Sections 5.2(b) and (c) above).

      (e)    The six (6) month or one (1) year time period referred to above shall be tolled on a day-for-day basis for each day during which Employee participates in any activity in violation of this Section 5.2 of this Agreement so that Employee is restricted from engaging in the conduct referred to in this Section 5.2 for a full six (6) months or one (1) year, as the case may be.

      (f)    For purposes of this Section 5.2, designated market area shall mean the Designated Market Area ("DMA") as defined by The A.C. Nielsen Company (or such other similar term as is used from time to time in the television broadcast community).

      (g)    For purposes of this Section 5.2, Metro Survey Area shall mean the Metro Survey Area ("MSA"), as defined from time to time by the Arbitron Company (or such other similar term as is used from time to time in the radio broadcast community).

      5.3.   *__Acknowledgment__*.  Employee acknowledges and agrees that this Agreement (including, without limitation, the provisions of Sections 5 and 6) is a condition of Employee's being employed by SCI, Employee's having access to Confidential Information, Employee's being eligible to receive the items referred to in Sections 3 and Schedule A (including, without limitation, Employee's eligibility to participate in the LTIP), Employee's advancement at SCI, and Employee being eligible to receive other special benefits at SCI; and further, that this Agreement is entered into, and is reasonably necessary, to protect the Company Entities' investment in Employee's training and development, and to protect the goodwill and other business interests of the Company Entities.

6.    *__Remedies__*.

      6.1. *__Injunctive Relief__*. The covenants and obligations contained in Section 5 relate to matters which are of a special, unique, and extraordinary character and a violation of any of the terms of such Section will cause irreparable injury to the Company Entities,

dramemp.agr

7

the amount of which will be impossible to estimate or determine and which cannot be adequately compensated. Therefore, Company Entities will be entitled to an injunction, restraining order or other equitable relief from any court of competent jurisdiction (subject to such terms and conditions that the court determines appropriate), restraining any violation or threatened violation of any of such terms by Employee and such other persons as the court orders. The parties acknowledge and agree that judicial action, rather than arbitration, is appropriate with respect to the enforcement of the provisions of Section 5. The forum for any litigation hereunder shall be the Circuit Court of Baltimore County or the United States District Court (Northern Division) sitting in Baltimore, Maryland.

6.2.    *Cumulative Rights and Remedies*.  Rights and remedies provided by Section 5 are cumulative and are in addition to any other rights and remedies any of the Company Entities may have at law or equity.

7.·    *Absence of Restrictions*.  Employee warrants and represents that Employee is not a party to or bound by any agreement, contract, or understanding, whether of employment or otherwise, with any third person or entity which would in any way restrict or prohibit Employee from undertaking or performing employment with SCI in accordance with the terms and conditions of this Agreement.

8.    *Miscellaneous*.

8.1.    *Attorneys' Fees*.  In any action, litigation, or proceeding (collectively, "Action") between the parties arising out of or in relation to this Agreement, the prevailing party in the Action will be awarded, in addition to any damages, injunctions, or other relief, and without regard to whether such Action is prosecuted to final appeal, such party's costs and expenses, including reasonable attorneys' fees.

8.2.    *Headings*.  The descriptive headings of the Sections of this Agreement are inserted for convenience only, and do not constitute a part of this Agreement.

8.3.    *Notices*.  All notices and other communications hereunder shall be in writing and shall be deemed given upon (a) oral or written confirmation of a receipt of a facsimile transmission, (b) confirmed delivery of a standard overnight courier or when delivered by hand, or (c) the expiration of five (5) business days after the date mailed, postage prepaid, to the parties at the following addresses:

|  |  |
|---|---|
| If to SCI to: | Sinclair Communications, Inc. |
|  | 2000 W. 41st Street |

dramemp.agr

8

Baltimore, Maryland 21211

Attn: President

If to Employee to:       **Michael Draman**
2000 W. 41st Street
Baltimore, Maryland 21211

or to such other address as will be furnished in writing by any party. Any such notice or communication will be deemed to have been given as of the date so mailed.

8.4.   *Assignment*. SCI may assign this Agreement to any of the Company Entities, and Employee hereby consents and agrees to be bound by any such assignment by SCI. Employee may not assign, transfer, or delegate Employee's rights or obligations under this Agreement and any attempt to do so is void. This Agreement is binding on and inures to the benefit of the parties, their successors and assigns, and the executors, administrators, and other legal representatives of Employee. No other third parties, other than Company Entities, shall have, or are intended to have, any rights under this Agreement.

8.5.   *Counterparts*. This Agreement may be signed in one or more counterparts.

8.6.   *Governing Law*. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MARYLAND (REGARDLESS OF THE LAWS THAT MIGHT BE APPLICABLE UNDER PRINCIPLES OF CONFLICTS OF LAW) AS TO ALL MATTERS (INCLUDING VALIDITY, CONSTRUCTION, EFFECT, AND PERFORMANCE.)

8.7.   *Severability*. If the scope of any provision contained in this Agreement is too broad to permit enforcement of such provision to its full extent, then such provision shall be enforced to the maximum extent permitted by law, and Employee hereby consents that such scope may be reformed or modified accordingly, and enforced as reformed or modified, in any proceeding brought to enforce such provision. Subject to the immediately preceding sentence, whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision, to the extent of such prohibition or invalidity, shall not be deemed to be a part of this Agreement, and shall not invalidate the remainder of such provision or the remaining provisions of this Agreement.

dramemp.agr

9

8.8.   *Entire Agreement*.  This Agreement, including the Schedules attached hereto, and the LTIP constitute the entire agreement, and supersede all prior agreements and understandings, written or oral, among the parties with respect to the subject matter of this Agreement and the LTIP.  This Agreement may not be amended or modified except by agreement in writing, signed by the party against whom enforcement of any waiver, amendment, modification, or discharge is sought.

8.9.   *Interpretation*.   This Agreement is being entered into among competent and experienced business professionals (who have had an opportunity to consult with counsel), and any ambiguous language in this Agreement will not necessarily be construed against any particular party as the drafter of such language.

8.10.  *Continuing Obligations*.  The following provisions of this Agreement will continue and survive the termination of this Agreement:  4.2, 5, 6, 7 and 8.

8.11.  *Taxes*.  SCI may withhold from any payments under this Agreement all applicable federal, state, city, or other taxes required by applicable law to be so withheld.

8.12.  *Arbitration and Extension of Time*.  Except as specifically provided in Section 6, any dispute or controversy arising out of or relating to this Agreement shall be determined and settled by arbitration in Baltimore, Maryland in accordance with the Commercial Rules of the American Arbitration Association then in effect, the Federal Arbitration Act, 9 U.S.C. § 1 et seq., and the Maryland Uniform Arbitration Act, and judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction.  The expenses of the arbitration shall be borne by the non-prevailing party to the arbitration, including, but not limited to, the cost of experts, evidence, and legal counsel.  Whenever any action is required to be taken under this Agreement within a specified period of time and the taking of such action is materially affected by a matter submitted to arbitration, such period shall automatically be extended by the number of days, plus ten (10) that are taken for the determination of that matter by the arbitrator(s).  Notwithstanding the foregoing, the parties agree to use their best reasonable efforts to minimize the costs and frequency of arbitration hereunder.

**THIS AGREEMENT CONTAINS A WAIVER OF YOUR RIGHT TO A TRIAL BY COURT OR JURY IN EMPLOYMENT DISPUTES.**

**THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES.**

dramemp.agr

10

FEB-19-2003  15:18          THOMAS & LIBOWITZ                      4107520979    P.13/19

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement effective as of the date first written above.

SINCLAIR COMMUNICATIONS, INC.

By: _____

Its: _____

MICHAEL DRAMAN

dramemp.agr

11

**Michael Draman**

## SCHEDULE A

## COMPENSATION AND OTHER BENEFITS

1. ***Base Salary***.  As full compensation for the services to be rendered by Employee pursuant to this Agreement, during and with respect to the Employment Term, SCI will pay Employee an annual salary during each employment year, at a rate equal to - Two Hundred Thirty Thousand Dollars ($230,000.00) (the "Base Salary"), payable in arrears, semi-monthly or otherwise, in accordance with SCI's regular payroll procedures (but not less than monthly).

2. ***Vacation***.  While employed by SCI, Employee shall be entitled to paid vacation leave in accordance with such policies in effect at SCI from time to time.

3. ***Health Insurance and Other Benefits***.  During the Employment Term, Employee shall be eligible to participate in health insurance programs that may from time to time be provided by SCI for its employees generally, and Employee shall be eligible to participate in other employee benefit plans that may from time to time be provided by SCI to its employees generally; provided, the 90-day waiting period normally required to be eligible for health insurance will be waived.

4. ***Expenses***.  SCI will pay or reimburse Employee from time to time for all expenses incurred by Employee during the Employment Term on behalf of SCI in accordance with corporate policies established by SCI; provided, that (i) such expenses must be reasonable business expenses, and (ii) Employee supplies to SCI itemized accounts or receipts in accordance with SCI's procedures and policies with respect to reimbursement of expenses in effect from time to time.

5. ***Bonuses***.  During each of the first, second and third employment year, Employee will be eligible to receive an annual bonus of up to Twenty-Five Thousand Dollars ($25,000.00), Forty-Five Thousand Dollars ($45,000.00) and Sixty-Five Thousand Dollars ($65,000.00), respectively, for meeting certain objectives to be determined by the Chief Executive Officer of SCI.

6. ***Tax Issues***.  To the extent taxable to Employee, Employee will be responsible for accounting for and payments of taxes on the benefits provided to Employee

dramcomp.agr

1

by SCI, and Employee will keep such records regarding uses of these benefits as SCI reasonably requires and will furnish SCI all such information as may be reasonably requested by SCI with respect to such benefits.

7.    *Automobile*.  During the Employment Term, Employee will be permitted to use trade for the broadcast time of a television station owned and/or operated by SCI to purchase or lease (as determined by the Chief Executive Officer) for the use of Employee an automobile selected by SCI; provided, however, that (i) the terms thereof may not, without the express consent of Chief Executive Officer, involve a greater than 1.5:1 exchange rate of the value of broadcast time to the retail value of the automobile and (ii) the automobile may not be obtained from any entity that is or at any time within the immediately preceding twelve months has been a cash account of any such station.  The leasehold or ownership interest in such automobile shall remain the property of SCI.  A replacement automobile for the use of Employer may be obtained after the expiration of three years from the date the automobile was originally obtained.  SCI will also reimburse Employee for gasoline used for business purposes and insurance on said automobile.

8.    *Options.*    Following the second employment year, Employee will be eligible to receive, in accordance with the Employment Agreement to which this is Schedule A, grants of options (the "New Options") to acquire twenty thousand (20,000) shares of stock of SBG on the same terms and conditions as are contained in the LTIP Stock Option Agreement (the "Existing Agreement") attached to Employee's Employment Agreement, except that (i) the exercise price for the New Options will be determined by SCI's Chief Executive Officer and (ii) in the option agreement relating to the New Options, references to the grant date of any of the New Options will be substituted for references in the Existing Agreement to the Hire Date.

9.    *Moving Expenses.*

9.1.  SCI will pay the reasonable expenses, not in excess of $10,000 (unless a higher amount is approved by the Chief Executive Officer), of moving Employee's household goods from Atlanta, Georgia to Baltimore, Maryland.  At SCI's option Employee agrees to use a moving company designated by SCI.  SCI will also reimburse Employee for reasonable expenses (including airfare) incurred in relocating Employee and his immediate family to Baltimore.

dramcomp.agr

2

9.2.  SCI will reimburse Employee for three (3) round trip airfares (unless a higher number is approved by the Chief Executive Officer) from Atlanta, Georgia to Baltimore, Maryland and up to three (3) nights hotel accommodations, including meals and a rental car, per trip, in order for Employee and his wife to search for suitable housing in the Baltimore area.

10.    *Temporary Housing.*  SCI will reimburse Employee for all reasonable expenses (including rent and utilities) incurred in obtaining temporary housing in Baltimore, Maryland for a period of up to 90 days.

11.    *Primary Residence Relocation.*

11.1.  SCI will reimburse Employee for 50% of the "points" paid by Employee in connection with the financing of Employee's purchase of a home in the Baltimore, Maryland area; provided, in no event will SCI reimburse Employee for more than 1.5% of the amount of such financing.

11.2.  In connection with the financing of Employee's purchase of a home in the Baltimore, Maryland area, SCI will provide a guarantee to Employee's lender of an amount not in excess of $200,000.  In consideration of this guarantee and to secure Employee's obligation to repay SCI any amounts it is forced to pay under such guarantee, Employee will pledge (by execution of security documents prepared by SCI) any and all options granted pursuant to paragraph 6 hereof, together with any common stock of SBG obtained as a result of the exercise of such options; provided, at Employee's request SCI will consider consenting to the release of such stock, which consent may be withheld in the sole and absolute discretion of SCI.  Employee further agrees that Employee's right to receive annual bonuses pursuant to paragraph 5 hereof is subject to SCI's right to set-off such bonuses against any amounts Employee owes to SCI pursuant to Employee's obligations to repay SCI any amounts it is forced to pay under the guarantee referred to in this paragraph 11.2.

drumcomp.agr

3

# AMENDMENT NO. 1

AMENDMENT, dated as of August 3, 1998, by and between SCI and Employee to the Employment Agreement (the "Agreement") dated as of the 10th day of February, 1997, between Sinclair Communications, Inc. and Michael Draman.  Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Agreement.

## RECITALS

A.    Employee is currently employed as Vice President-Television Sales and Marketing of SCI pursuant to the terms of the Agreement.

B.    SCI and Employee desire to amend certain of the terms of the Agreement as set forth herein.

NOW, THEREFORE, IN CONSIDERATION OF the mutual covenants herein contained, the parties hereto agree as follows:

1.    In the first sentence of Section 2 of the Agreement, the clause "and continue until the third anniversary of the Effective Date" is hereby deleted and replaced with "and will terminate on December 31, 2002."

2.    The last sentence of Section 2 of the Agreement is hereby deleted in its entirety and replaced with the following:  "As used in this Agreement, an employment year is a twelve (12) month period beginning on January 1 and ending on the next following December 31; provided, the first employment year will begin on the Effective Date and end on December 31, 1997."

3.    Section 3 of the Agreement is hereby amended by deleting the last sentence thereof in its entirety and replacing it with the following:

"Employee will be granted, effective as of February 1, 1998 (the "Effective Date"), additional options under the LTIP to acquire sixty thousand (60,000) shares of stock of Parent at a purchase price of $24.20, with a vesting schedule pursuant to which 25% of such options will vest on the third anniversary of the Effective Date and an additional 25% of such options will vest on each of the next three anniversaries thereof; provided, if Employee's employment with SCI terminates pursuant to Section 4.1(a)(4), SCI shall cause Parent to accelerate the vesting, effective as of the Termination Date, of those options which would have vested on or prior to the first anniversary of the Termination Date; provided further, if Employee's employment with SCI terminates in accordance with the terms of the Agreement on December 31, 2002, SCI shall cause parent to accelerate the vesting, effective immediately prior to the termination of employment, of those options which would have vested on February 1, 2003."

michael draman-amendment-one.agr                1

EXHIBIT B

4.    Clause (3) of Section 4.1(a) of the Agreement is hereby deleted in its entirety and replaced with the designation "Intentionally Omitted."

5.    Clause (4) of Section 4.1(a) of the Agreement is hereby deleted in its entirety and replaced with the following:

"the election by SCI, by notice in writing given at any time, to terminate Employee's employment on the date specified in such notice, without Cause (as defined in Section 4.1(c) below);"

6.    Section 4.2(c) of the Agreement is hereby redesignated as Section 4.2(d) of the Agreement and new Section 4.2(c) of the Agreement is hereby inserted to read as follows:

"(c) If Employee's employment with SCI terminates pursuant to Section 4.1(a)(4), in addition to the amounts designated under Section 4.2(a), Employee will be entitled to receive, and SCI will pay to Employee, all of the following:

(1) the salary payable to Employee for the one-year period ending on the first anniversary of the Termination Date, such salary to be paid on the dates when such salary would have been paid in accordance with SCI's normal payroll procedure; and

(2) any bonuses which would have been earned by Employee during the one-year period ending on the first anniversary of the Termination Date, such bonuses, if any, to be paid on the dates they would have been paid had Employee remained an employee of SCI during such period."

7.    Section 1 of Schedule A to the Agreement is hereby amended by adding the following proviso at the end thereof:

"provided, on January 1, 1999 and on each January 1 thereafter occurring during the Employment Term, the Base Salary then in effect shall increase by 7.5%."

8.    Section 5 of Schedule A to the Agreement is hereby deleted in its entirety and replaced with the following:

"During the first employment year, Employee will be entitled to receive an annual bonus of up to Twenty-Five Thousand Dollars ($25,000) for meeting certain objectives to be determined by the Chief Executive Office. Such annual bonus shall be up to Fifteen Thousand Dollars ($15,000) in the second employment year, which annual bonus amount shall increase by 5% on January 1, 1999 and on each January 1 thereafter."

In addition, during each calendar quarter of the second employment year and of each employment year thereafter, Employee will be eligible to receive a bonus of up to Seven Thousand Five Hundred Dollars ($7,500) subject to annual 5% increases on January 1,

michael draman-amendment one.agr                    2

1999 and on each January 1st thereafter. The quarterly bonus for the second employment year and for each employment year thereafter will consist of two equal parts as follows:

(a)    for achieving broadcast cash flow goals established for all of the television stations owned and/or operated by any of the Company Entities (the "Stations"), taken as a whole and

(b)    for achieving net broadcast revenue goals established for the Stations, taken as a whole. The following percentages of the quarterly bonus will be earned for achieving the below designated percentages of broadcast cash flow or net broadcast revenue, as applicable:

| % ACHIEVED | BONUS EARNED |
| --- | --- |
| 95% | 50% |
| 96% | 60% |
| 97% | 70% |
| 98% | 80% |
| 99% | 90% |
| 100%+ | 100% |

Notwithstanding anything to the contrary contained herein, any portion of a quarterly bonus not earned may be "recaptured" based on the percentage of broadcast cash flow or net broadcast revenue goal achieved for the entire employment year in which such quarter falls.

9.    Except as specifically amended hereby, the Agreement will remain in full force and effect without amendment or modification thereto.

10.    This Amendment may be signed in one or more counterparts.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment effective as of the date first written above.

SINCLAIR COMMUNICATIONS, INC.

By: _____
Name:
Title:

MICHAEL DRAMAN

michael draman-amendment one.agr                    3

## GENERAL RELEASE

1.    For and in consideration of the promise by Sinclair Broadcast Group, Inc., ("SBG") and Sinclair Communications, Inc. ("SCI", and together with SBG, "Sinclair") to me, Michael Draman ("Employee"), to: (a) continue my current base pay less applicable withholding for seven (7) months past my last day of employment which is April 23, 2001, (b) continue current medical and dental coverage with corresponding payroll deductions through August 23, 2001, and (c) allow Employee to continue use of Sinclair's Lincoln Navigator (the "Automobile") until November 23, 2001 under the same terms as present, all on the terms and conditions hereafter set forth, Employee, Employee's agents, heirs, family members, and assigns (collectively the "Employee Parties") hereby release and forever discharge Sinclair, its affiliated and related entities, and their directors, officers, employees, agents, attorneys, and assigns, and any person or entity acting by, through, or in concert with any of them (collectively the "Sinclair Parties") from and against any and all manner of actions, liability, claims, back pay, claims for wages, vacation pay, sick pay, bonuses, pension contributions or benefits, or other employee benefits, and claims and demands of every other kind resulting from or based upon:  (w) any fact or condition existing from the beginning of Employee's employment with any of the Sinclair Parties to the date hereof, (x) Employee's employment with any of the Sinclair Parties or the separation therefrom, (y) the Employment Agreement, dated as of February 10, 1997, between SCI and Employee, as amended by the Amendment dated August 3, 1998 (the "Employment Agreement") including, without limitation, Section 4.2 (c) of the Employment Agreement, and (z) any employment practice, custom, or policy of any of the Sinclair Parties; provided however, the consideration to be provided by Sinclair set forth in clauses (a), (b) and (c) above shall immediately terminate with respect to any period following the "Effective Date" (as defined below) provided further, however, nothing herein shall be treated as a release of any claims for pay through the last day of work and for any accrued but unused vacation and personal days through the last day of work.

2.    Employee only shall be entitled to the payments referred to above if Employee signs this General Release ("Release") and delivers the same to Sinclair within twenty one (21) days of receipt and does not revoke within the revocation period provided below.  If Employee does not sign and deliver this Release within twenty one (21) days of receipt or if Employee signs this Release and revokes within the seven (7) day revocation period described below, Employee shall be entitled to no payments or other consideration whatsoever.  Provided Employee signs this Release and does not thereafter revoke, the payments referred to above shall begin on the next regularly scheduled pay date occurring more than 10 days after the Employee delivers this signed Release to Sinclair with a retroactive payment of any amounts which would have been due prior to when the payments began being made.

3.    Employee acknowledges and agrees that the claims released and discharged hereby include, but are not limited to, claims that have been or could be asserted under:  (a) the common law of the State of Maryland; (b) Title VII of the Civil Rights Act of 1964, as amended; (c) the Maryland Fair Employment Practices Act; (d) the

**EXHIBIT C**

Age Discrimination in Employment Act, including the Older Workers' Benefit Protection Act; (e) the Civil Rights Act of 1866; (f) the Americans with Disabilities Act; (g) the Civil Rights Act of 1991; (h) the Family and Medical Leave Act; (i) the National Labor Relations Act, (j) any other federal, state or local law, constitution, regulation, ordinance, decision or common law claim concerning employment, wages, discrimination in employment, or termination of employment; (k) any and all claims for personal injury, emotional distress, libel, slander, defamation, and other physical, economic, or emotional injury; and (l) all claims for attorney's fees and costs.  Employee does not hereby waive any rights or claims which may arise after execution of this release.

4.      Employee acknowledges that Employee has been advised to seek an attorney for advice regarding the effect of this Release prior to signing it.  Employee also acknowledges that Employee was offered and was advised that Employee could take up to twenty-one (21) days to study this Release before signing it.  Employee understands that Employee has the right to revoke this Release for seven (7) days after signing.

5.      Except for Employee's right to continue use of the Automobile until November 23, 2001, on or before April 23, 2001, Employee shall return to Sinclair all information and property of any of the Sinclair Parties including, but not limited to, all keys to all buildings, offices, and file cabinets, credit cards, air travel cards, telephone calling cards, files, memoranda, mobile phone, pager, office equipment, computers, customer lists, any information concerning any of the Sinclair Parties' customers, and any and all documents relating to Sinclair's business or the business of any of the Sinclair Parties including all such information recorded on computer disks or in any computer-readable form, copies of any items mentioned herein, and all physical or personal property which employee received, prepared, or helped to prepare during the course of her employment with any of the Sinclair Parties.  Except for Employee's right to continue use of the Automobile until November 23, 2001, Employee understands that employee is not to retain any property, documents, or computer records relating to Sinclair in any way.

6.      Employee acknowledges and agrees that Employee will continue to be bound by any post-employment obligations including (without limitation) those set forth in Section 5.2 of the Employment Agreement; provided, Employee and Sinclair agree that Section 5.2 of the Employment Agreement is hereby amended to substitute a reference to "seven (7) months" for each of the references to "six (6) months" contained therein; provided further, upon the receipt of a written notice from Employee to Sinclair (attention Vice President, Human Resources) that Employee intends to participate in an activity which would cause Employee to be in violation of Section 5.2 (a) (i) of the Employment Agreement, which notice shall specify the date (the "Effective Date") that such participation will begin, Sinclair will immediately provide Employee with a written waiver of the restriction set forth in Section 5.2 (a) (i) to allow Employee to participate in such activity as of the Effective Date; provided finally, in no event may the Effective Date be prior to July 23, 2001.

7.    Employee acknowledges having read this Release, and that Employee fully understands the provisions hereof, and is voluntarily executing the same with full knowledge of its significance.

8.    The Sinclair parties will take no action and make no statements which would disparage Employee; Employee will likewise make no statements and take no action which would disparage the Sinclair Parties.

EMPLOYEE

Date

SINCLAIR BROADCAST GROUP, INC.

By

Its _VP HR_

_4/23/01_
Date